UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CR-60253-MOORE/LOUIS

UNITED STATES OF AMERICA

v.

LAWRENCE ALEXANDER,

        Defendant.

_____

**GOVERNMENT'S SENTENCING MEMORANDUM AS TO DEFENDANT
LAWRENCE ALEXANDER AND RESPONSE TO DEFENDANT LAWRENCE
ALEXANDER'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

    The United States, through undersigned counsel, respectfully files this sentencing memorandum regarding Defendant Lawrence Alexander and response to his objections to the Presentence Investigation Report ("PSR"). (D.E. 427.) As a medical doctor and surgeon, Defendant knew that lying to Medicare was a crime. Yet, he lied to Medicare to hide Jeremy Waxman's and his own ownership of a durable medical equipment supplier ("DME") enrolled in Medicare, used his mother as a straw owner of that company, and, as a result, the DME company he co-owned was able to submit over $960,000 in false and fraudulent claims. Defendant Alexander should receive a Guidelines sentence. This recommendation is commensurate with the injury Defendant caused to Medicare, the federal health care program intended to help the elderly, blind, and disabled.

    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

    On August 21, 2021, a grand jury returned an indictment charging Defendant with (i) conspiracy to defraud the United States and pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 (Count 6), and (ii) false statements related to health care matters, in violation

of 18 U.S.C. §§ 1035(a)(2) and 2 (Count 19). (D.E. 1 at 18-28, 31.) Defendant and one of his co-defendants, Dean Zusmer, proceeded to trial. On January 30, 2023, after a nine-day trial, a jury convicted Defendant on Count 19 and acquitted him on Count 6. (D.E. 359.) The evidence at trial proved that Defendant aided and abetted the submission of the CMS 855S form dated January 14, 2019, to Medicare that contained false statements regarding the ownership and management of Silent Hill Bracing & Orthopedic Supplies ("Silent Hill"). The form, like others submitted before it, listed Defendant's mother, Susan Alexander, as the sole owner and manager (GX 41; GX 108 at 8, 10; D.E. 396 at 28-30, 170-71) and did not disclose Jeremy Waxman or Defendant as an owner or manager. (GX 108.) This was a materially false statement to Medicare. Medicare required that providers disclose all 5% or more owners and managers (D.E. 395 at 273-74), and the CMS 855S form explicitly demanded this disclosure and informed the provider of its continuing obligation to inform Medicare immediately of any changes to its ownership or management. (*See* GX 108 at 2, 26.) Here, Silent Hill was required to submit a CMS 855S when it changed information related to enrollment—such as hours of operation—and Medicare relied on the veracity and completeness of the information in that CMS 855S form in determining whether Silent Hill remained eligible to maintain its enrollment and billing privileges.

The false statement on the CMS 855S form mattered to Medicare. Indeed, a Medicare program witness testified at trial that had Medicare become aware that a DME supplier failed to disclose an owner, manager, or an officer of the entity, Medicare could have: (i) revoked the provider's enrollment status; (ii) reversed claims that were already paid or sought overpayment from the entity (as well as its owner, managers, and officers); and/or (iii) referred the provider to law enforcement. (D.E. 395 at 275-76.) If Medicare discovered this fact, it could have—and likely would have—revoked enrollment and/or reversed claims.

Defendant and Waxman should have been disclosed as owners of Silent Hill on the CMS 855S form. Waxman and Defendant were continuously 50/50 owners of Silent Hill, and Susan Alexander never worked for Silent Hill. (D.E. 398 at 173-743, 185-86, 191-92, 215, 222; GX 73, 1092, 1251, 1255.) Defendant was involved in Silent Hill's operations, including opening Silent Hill bank accounts, writing checks at the start of the business, and discussing the business with Waxman. (D.E. 398 at 176-81.) Defendant remained a signatory on the Silent Hill bank account that received Medicare funds and enjoyed profits from the scheme. (D.E. 398 at 178; GX 73, 204A.) Waxman managed Silent Hill. (D.E. 398 at 221, D.E. 399 at 292-93; GX 1091, 204A.) Witnesses who worked with Silent Hill testified that they believed Waxman ran Silent Hill and had never heard of Susan Alexander. (*See, e.g.*, D.E. 396 at 233-34; D.E. 397 at 77-79.) Notably, Defendant, as the cornerstone of his defense to Count 6, embraced the theory that Waxman was managing the DME business. (D.E. 403 at 62-67.)

Defendant also played an essential role in the false statement on the CMS 855S form, and he acted knowingly and willfully. Indeed, it was Defendant's idea from the very beginning to use his mother as the straw owner on the CMS 855S forms for Silent Hill. (D.E. 398 at 165, 180-82; D.E. 400 at 9-10.) For the initial CMS 855S form for Silent Hill submitted to Medicare in 2016, Defendant obtained and provided to Waxman his mother's fingerprints, Social Security number, other personal information, and signature to permit Silent Hill to enroll in Medicare under her name. (*See, e.g.*, D.E. 398 at 196; D.E. 400 at 99, 129; GX 107K, 108.) Defendant approved the filing of the CMS 855S forms prior to submission as a matter of course. (D.E. 399 at 286-87.) Waxman also received Defendant's permission to sign documents. (*Id.*; D.E. 400 at 37.) At trial, Waxman testified that he never signed Susan Alexander's name without Defendant's approval. (D.E. 399 at 287; *see also* D.E. 398 at 199.)

Defendant knew it was illegal to lie to Medicare and falsely disclose his mother as the sole owner and manager of Silent Hill. For example, on September 14, 2016, Defendant received the letter warning that (i) Silent Hill had an ongoing duty to disclose anyone who was more than a 5% owner and any managing employee(s) and (ii) only Susan Alexander had been disclosed as an owner, which was after the initial CMS 855S form was submitted. (GX 1057, 1057A, 1058; D.E. 400 at 132-33.) Defendant added Waxman to the bank accounts, was informed that Silent Hill was getting paid by Medicare, lied that his mother was his wife on a surety bond, and received his portion of Silent Hill's profits—all after the initial CMS 855S form was filed in August 2016 but before the January 14, 2019, CMS 855S form was filed. (*See, e.g.*, GX 73, 1088, 1088A, 1089, 1090, 1092; DX 7LA at 1, 14, 29.)

Defendant was well aware that lying to Medicare was a crime. Most notably, as an enrolled provider himself (as a physician), he executed these forms routinely. Each CMS 855 form—whether for a DME, a physician, or a medical practice—states on its face that the signatory is certifying to the truthfulness of all information in the form, that it is a crime to lie on the form, and that lying on the form could result in denial or revocation from the Medicare program (and thus the ability to bill and be paid by Medicare). (*See, e.g.*, GX 108; D.E. 396 at 70-72, 112-17.)

## II.   THE GOVERNMENT'S RECOMMENDED SENTENCING GUIDELINES

The PSR accurately calculates the applicable guidelines range (PSR ¶¶ 100-08), and the government recommends the following calculations under the United States Sentencing Guidelines ("Guidelines").

### A.   Base Offense Level Computation, § U.S.S.G. 2B1.1(a)(2)

As the PSR correctly calculated, the Base Offense Level for Defendant's conviction for violation of 18 U.S.C. § 1035 is six. (PSR ¶ 100.)

### B.     Intended Loss Computation, U.S.S.G. § 2B1.1(b)(1)(H)

The PSR correctly calculated the Intended Loss as a 14-point increase. (PSR ¶ 101.) Defendant is accountable for a loss of $964,145. The Guidelines instruct a district court to apply a 14-level enhancement when an offense involving fraud or deceit results in loss exceeding $550,000 but less than $1,500,000. U.S.S.G. § 2B1.1(b)(1)(H). The loss amount "is the greater of the actual loss or intended loss." *Id.* at § 2B1.1, cmt. n.3(A). Actual loss is the reasonably foreseeable pecuniary harm that results from the crime. *Id.* at § 2B1.1, cmt. n.3(A)(i). Intended loss is the pecuniary harm that the defendant purposefully sought to inflict, even if it would have been impossible or unlikely to occur. *Id.* at § 2B1.1, cmt. n.3(A)(ii). Because the amount of loss is often difficult to precisely determine, a district court's amount of loss determination need only be a reasonable estimate. *United States v. Leyva*, 752 F. App'x 825, 826 (11th Cir. 2018) (citation omitted). The government has the burden of proving the loss amount by a preponderance of the evidence, which must be reliable and specific. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007).

In several instructive health care fraud cases, the Eleventh Circuit has approved the use of the amount billed to insurers to calculate intended loss. *See United States v. Duran*, 620 F. App'x 687, 690-91 (11th Cir. 2013) (finding that "using the amount billed to Medicare as an estimate for the amount of loss was reasonable" and rejecting defendants' argument that they could not have received the full amount billed, noting that "intended loss includes pecuniary harm that would have been impossible or unlikely to occur."); *United States v. Cruz-Natal*, 150 F. App'x 961, 964 (11th Cir. 2005) (approving use of billed amount to calculate intended loss in Medicare fraud case "because the intended loss is easily calculated and greater than the actual loss").

This conclusion that the billed amount is the proper loss measurement is supported by the

5

commentary to the Guidelines, which specifies that when a defendant is convicted of a federal health care offense involving a government health care program, the aggregate dollar amount of fraudulent bills constitutes *prima facie* evidence of the amount of the intended loss, if not rebutted. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(viii); *see also United States v. Melgen*, 967 F.3d 1250, 1265-66 (11th Cir. 2020) (finding that the starting point for calculating the loss amount was the amount the defendant sought in the fraudulent bills submitted to Medicare, and the district court did not err in concluding that the defendant had failed to rebut the *prima facie* evidence of loss because defendant's arguments were based on "pure speculation" that some patients could have benefitted from the defendant's treatment).

Here, the intended loss (*i.e.*, the amount billed to Medicare and Medicare Advantage Plans, $964,145) exceeds the actual loss (*i.e.*, the amount paid by Medicare and Medicare Advantage Plans, $378,845.42). Thus, intended loss is the correct loss amount. *See United States v. Moss*, 34 F.4th 1176, 1191-92 (11th Cir. 2022). Additionally, Defendant was convicted of a federal health care offense, and $964,145 is the aggregate dollar amount of fraudulent claims submitted to Medicare and Medicare Advantage plan sponsors which constitutes *prima facie* evidence of the amount of the intended loss. *See Melgen*, 967 F.3d at 1265-66. As discussed below, Defendant fails to rebut this *prima facie* evidence of loss. Therefore, the PSR correctly calculates an intended loss amount of $964,145. (PSR ¶ 76.)

    **C.**    **Guidelines Range**

As the PSR appropriately calculates, Defendant's total Offense Level is 20 with a Criminal History Category of I. Therefore, Defendant's Guidelines imprisonment range is 33 to 41 months. (PSR ¶ 163.)

### III. THE GOVERNMENT'S RESPONSES TO DEFENDANT'S OBJECTIONS TO THE PSR

#### A. Defendant's Objections to the PSR's Loss Amount Should Be Rejected.

Defendant asserts that there is a zero-dollar loss amount. (D.E. 427 at 4.) Defendant's assertion is wrong. The PSR's calculation is conservative as it only includes the claims billed by Silent Hill, Defendant and Waxman's company, to Medicare and Medicare Advantage plan sponsors on and after January 14, 2019,[1] the date Silent Hill submitted the false CMS 855S form in Count 19. (PSR ¶ 76.) Indeed, Silent Hill billed over $7.8 million in claims to Medicare and Medicare Advantage plan sponsors between May 1, 2017, and April 30, 2019. (GX 11.) As the government proved at trial, the total amount billed by Silent Hill to Medicare and Medicare Advantage Plans for the duration of the scheme is as follows:

|  | Total Billed Amount | Total Paid Amount |
|---|---|---|
| **Medicare, Part B** | $5,916,118 | $3,703,471 |
| **United Health Care, Part C** | $1,654,939 | $438,446 |
| **Humana, Part C** | $241,046 | $79,664 |
| **Total** | **$7,812,103** | **$4,221,581** |

(GX 39, 87; D.E. 396 at 205.) It also does not include any of the amounts billed or paid to the other three DMEs that were part of the scheme (Equilibrium, West Bay, and Active Assist).

Defendant first challenges the use of intended loss to calculate loss, claiming that the commentary in Section 2B1.1(b)(1) exceeds the text of the Guidelines. (*See* D.E. 427 at 2.) The Court should reject Defendant's argument. To support his argument that the Court should use the

---

[1] The PSR's loss calculation specifically includes the following items billed by Silent Hill on or after January 14, 2019: to Medicare Part B, $675,974; to United Health Care Part C, $275,381; and to Humana Part C, $12,790.

7

"actual" rather than "intended" loss amount, Defendant cites to a Third Circuit case, *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). (D.E. 429 at 4-5.) First, *Banks* is not controlling in this Circuit and is contrary to Eleventh Circuit case law. The Eleventh Circuit has long interpreted loss in the context of Section 2B1.1 to include intended loss. *See, e.g.*, *United States v. Moran*, 778 F.3d 942, 973-74 (11th Cir. 2015); *United States v. Massam*, 751 F.3d 1229, 1232 (11th Cir. 2014); *United States v. Patterson*, 595 F.2d 1324, 1326-27 (11th Cir. 2010); *United States v. Willis*, 560 F.3d 1246, 1250 (11th Cir. 2009); *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291-92 (11th Cir. 2001); *United States v. Toussaint*, 84 F.3d 1406, 1407-08 (11th Cir. 1996). Courts have continued to apply intended loss after the ruling in *Banks*. *See, e.g.*, *United States v. Hernandez*, No. 22-10406, 2023 WL 309571, at *2 (11th Cir. Jan. 19, 2023); *Lantigua v. United States*, No. 3:16-CR-125-TJC-PDB, 2023 WL 2303050, at *13 (M.D. Fla. Mar. 1, 2023). The Court should reject Defendant's argument and apply a 16-level increase for loss.

Further, nothing in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)—the Supreme Court precedent upon which *Banks* relies—dictates that the term "loss" should be limited to "actual loss." Indeed, *Kisor* did not interpret the Sentencing Guidelines at all. In *Kisor*, the U.S. Supreme Court considered but rejected a challenge to *Auer*/*Seminole Rock* deference, a long-standing practice of deferring to agencies' reasonable readings of "genuinely ambiguous" regulations. *See* 139 S. Ct. at 2408. As the *Kisor* Court explained, first, "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415. Then, "[i]f genuine ambiguity remains," a court must ensure that "the agency's reading [is] reasonable," meaning that it "must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415-16 (quotations and citations omitted). Critically, *Kisor* did not purport to overrule the "long line of precedents" that rely on *Auer*/*Seminole Rock* deference, including *Stinson v. United States*, 508

8

U.S. 36 (1993), which considered the deference owed to the Guidelines' commentary. *See id.* at 2422. Indeed, *Kisor* expressly denied any intent to "cast doubt on many settled constructions of rules" and inject "instability into so many areas of law." *Id.* Indeed, as the Eleventh Circuit explained (post-*Banks*) in *United States v. Corker*, No. 22-10192, 2023 WL 1777195 (11th Cir. Feb. 6, 2023), *Stinson* and *Kisor* "govern how much deference to give to Guidelines commentary," not "whether binding precedent holds that Application Note 3(A) . . . [is] inconsistent with the Guidelines' text . . . ." *Id.* at *4 (upholding on plain error review the use of intended rather than actual loss).

About three years after *Kisor*, the Eleventh Circuit upheld the use of "intended loss" under Section 2B1.1(b)(1) in *Moss*, 34 F.4th at 1192. In so doing, the Eleventh Circuit "explicitly rejected the argument that Application Note 3(A) to § 2B1.1, instructing courts to calculate 'the greater of actual loss or intended loss,' contradicts the plain meaning of the Guidelines' text." *Corker*, 2023 WL 1777195, at *4 (citing *Moss*, 34 F.4th at 1190)). In *Moss*, a defendant convicted of conspiracy to commit health care fraud and several counts of health care fraud challenged the district court's determination that his loss amount was the amount billed to government insurance programs as opposed to what was actually paid. *Id.* at 1190. Defendant primarily argued that he had rebutted the presumption that his loss amount was the amount billed because he knew that the programs would not reimburse the full amounts he submitted. *Id.* at 1191. Affirming the district court's loss calculation, the Eleventh Circuit stated that even if the defendant adequately rebutted the presumption, the "pecuniary harm that the defendant *purposely sought* to inflict . . . includes intended pecuniary harm that would have been impossible or *unlikely* to occur." 34 F.4th at 1191 (quoting § 2B1.1 cmt. n.3(A)(ii)) (emphasis in original) (internal quotation marks omitted). The Eleventh Circuit went on to note that:

9

> [w]hat makes it unlikely the actual loss will be as high as the full amount of the fraudulent insurance claim is that the claim exceeds the insured value, and insurance companies rarely if ever slip up and pay the excessive amount. The hypothetical defendant in that commentary example knew it was 'unlikely' the claim would be paid in full, but he submitted the full amount anyway with the greedy hope that he would mistakenly be paid the full amount.

*Id.*

Defendant's reliance on *United States v. Dupree*, 25 F.4th 1341 (11th Cir. 2022), also is misplaced. (D.E. 429 at 2-3.) *Dupree* is distinguishable from this case in that it interprets different language in a different chapter of the Guidelines, and it provides no basis for discarding the definition of "loss." In fact, the reasoning in *Dupree* can be applied in support of the Guidelines' definition of "loss." In *Dupree*, the Eleventh Circuit held that the Guidelines commentary cannot "expand" the meaning of "unambiguous sentencing Guidelines." 25 F.4th 1341 at 1273, 1274-78. Here, the natural reading of the term "loss" in context is that it covers what the Guidelines commentary says it does, and the term does not unambiguously exclude intended loss.

Accordingly, the Court should find Defendant's loss amount is between $550,000 and $1,500,000 and include a 14-point increase to his offense level. U.S.S.G. § 2B1.1(b)(1)(H). Defendant's arguments for a zero-dollar loss amount fail.

    **B.**    **Defendant's Objections to the PSR's Restitution Amount Should Be Rejected.**

Again, Defendant asserts that there is zero-dollar loss associated with his conviction for false statement, and thus a zero-dollar restitution amount. The PSR correctly (1) determines that restitution shall be ordered in this case pursuant to U.S.S.G. § 5E1.1 (PSR ¶ 173) and (2) calculates $378,845.42 as the total amount of restitution due and owing to Medicare Part B in the amount of $339,596.62; United Health Care Part C in the amount of $37,480.78; and to Humana Part C in the amount of $1,768.02 (PSR ¶ 172). The PSR applies the same conservative calculation for

restitution as it did for the loss amount, and it only includes the claims paid to Silent Hill by Medicare and Medicare Advantage plan sponsors on and after January 14, 2019, the date of the false statement.

Defendant seems to suggest that restitution does not apply to 18 U.S.C. § 1035 because the offense lacks a conspiracy or scheme element. The Court should reject the entirety of this argument. Foremost, 18 U.S.C. § 1035 is not a victimless crime. Any finding in contradiction would fail to recognize a health care benefits program as a victim and would allow health care fraudsters to run rampant through this district. Section 5E1.1 provides that the court shall enter a restitution order in the case of an identifiable victim. *See United States v. Bryson*, 485 F.3d 1205, 1207 (D.C. Cir. 2007) (affirming a district court order of restitution in a case in which the defendant pleaded guilty to one count of making false statements to Medicare in violation of 18 U.S.C. § 1035.) Here, Medicare and the Medicare Advantage plans are identifiable victims that experienced significant monetary harm. Defendant's offense conduct in violation of 18 U.S.C. § 1035 directly caused the victims' harm. As described above, Medicare would not have paid the claims on or after January 14, 2019, had it known that the CMS 855S form contained a material false statement. Each of the victims in this case provided a Declaration of Victim Losses. (PSR; D.E. 436-2.)

### C. Defendant's Factual Objections to the PSR Should Largely Be Rejected.

The government has no objection to Defendant's requested revisions to PSR ¶ 1.

The government objects to Defendant's requested revisions to PSR paragraphs 27, 29-30, 32, 46, 50, 51, 76, 89, and 93. In objecting to these paragraphs, Defendant is merely disputing the heart of his criminal conviction and raising the same arguments stated in his Motion for Judgment of Acquittal Under Fed. R. Crim. P. 29(c). (D.E. 412.) These should be rejected. After a nine-day

trial with over a dozen witnesses and dozens of exhibits, the jury convicted Defendant on Count 19. (D.E. 359.) As described at length in the government's Opposition to Defendant's Motion for Judgment of Acquittal under Fed. R. Crim. P. 29(c) and the Court's order denying the Motion for Judgment of Acquittal, Defendant's arguments fail. (D.E. 426, 446.)

### D. Defendant's Request for a Minor Role Reduction or a Downward Variance Should Be Rejected.

In Footnote 5, Defendant suggests that "[t]he Court should consider either a minor role reduction under § 3B1.2 or a downward variance on that basis." (D.E. 427 at 9.) Any reduction or downward variance should be rejected by the Court.

Defendant played a critical role in the scheme. It was Defendant's idea to use his mother as a straw owner. (D.E. 398 at 165, 180-82; D.E. 400 at 9-10.) Defendant was a 50/50 owner of Silent Hill, a fraudulent DME, and made a criminal choice to conceal his ownership from Medicare, hiding behind his mother's straw ownership that Waxman and he put into place in 2016. The CMS 855S forms would not have been submitted without Defendant. But for Defendant's role in organizing and managing his mother's straw ownership of Silent Hill—obtaining her signatures, social security number, and fingerprints for Medicare documentation—the false statement in the CMS 855S form would not have been submitted to Medicare. (*See, e.g.*, GX 107K, 108; D.E. 400 at 99, 129.) Defendant also lied on other documents to help hide Waxman's role, including to the Florida Secretary of State and on a surety bond for Silent Hill. (*See, e.g.*, D.E. 400 at 98-100 (listing Susan Alexander as Defendant's spouse); DX 4LA.) Accordingly, a request for a departure under § 3B1.2 in this case is inappropriate and should be denied.

### IV. SENTENCING FACTORS, 18 U.S.C. § 3553(A)

The sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence of 33 to 41 months' imprisonment.

    **A.**    **Section 3553(a)(1)(A): The nature and circumstances of the offense and the history and characteristics of the defendant.**

The government's recommended sentence achieves the purposes of sentencing as set forth in § 3553(a)(1)(A). Defendant's motivation was profits, not patient care. Defendant is an experienced medical professional and Medicare provider. He played a key role in stealing money from the Medicare program. As Defendant argued at trial, he did not need the money. He committed this crime for one reason: greed.

    **B.**    **Section 3553(a)(2): The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendants; and (D) to provide the defendants with appropriate education or vocational training.**

Defendant's punishment should take into account not only the seriousness of his criminal conduct, which is described above, but also the need to deter future criminals from defrauding health care programs. The money involved in the scheme came from Medicare, which is funded by American taxpayers and is intended to provide health care benefits to the elderly, blind, and disabled. Every dollar that Defendant fraudulently diverted from Medicare is a dollar that could have been used to provide valuable services to Medicare beneficiaries who truly needed medical care. The Court's sentence should reflect the scope and seriousness of this specific offense, as well as the need to promote the law, particularly in the face of continuing widespread fraud in this jurisdiction.

"Like bears to honey, white collar criminals are drawn to billion-dollar government programs." *United States v. Howard*, 28 F.4th 180, 186 (11th Cir.) (citation omitted). Section 3553(a)(2)(C) considers both specific deterrence as to the defendant and general deterrence as to the public. The Eleventh Circuit has made clear that general deterrence is especially important for white collar offenders, reasoning: "general deterrence is an important factor in white collar cases,

where the motivation is greed . . . we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). More specifically, in health care fraud cases, the Eleventh Circuit recently highlighted general deterrence as "a critical factor that must be considered and should play a role in sentencing defendants, including those who wear white collars and practice a profession." *Howard*, 28 F.4th at 208-09. (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]"); *see generally United States v. Kuhlman*, 711 F.3d 1321, 1328-29 (11th Cir. 2013) (collecting cases that have held non-incarceration sentences for white-collar crimes to be substantively unreasonable).

In *Howard*, the Eleventh Circuit found that the district court committed fundamental error by failing to properly consider the relevant sentencing factor of general deterrence, and relying on general deterrence in its reasoning, ultimately vacated the district court's probation sentence as substantively unreasonable. "In writing off general deterrence as a sentencing purpose when it comes to doctors who commit health care crimes, the district court undermined 'one of the primary objectives of the sentence' in such a case." 28 F.4th at 210. Accordingly, in this case, the government's recommended sentence of imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing as set forth in § 3553(a)(2).

V. **CONCLUSION**

Based on the considerations set forth above, the United States respectfully recommends that this Court sentence Defendant to a Guidelines imprisonment range of 33 to 41 months and

order restitution in the amount of $378,845.42.

Respectfully submitted,

GLENN S. LEON, CHIEF
FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

<u>/s/ *Meredith Hough*</u>
CATHERINE WAGNER
(FL Special Bar No. A5502410)
PATRICK QUEENAN
(FL Special Bar No. A5502715)
MEREDITH HOUGH
(FL Special Bar No. A5502915;
FL Bar No. 111553)
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Catherine.wagner@usdoj.gov
Patrick.queenan@usdoj.gov
Meredith.hough@usdoj.gov

COUNSEL FOR THE UNITED STATES

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 17, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

<u>/s/ *Meredith Hough*</u>
Meredith Hough
Trial Attorney

15